IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Judge Robert E. Blackburn

Civil Action No. 06-cv-01342-REB-CBS

LUCY QUINTANA,

    Plaintiff,

v.

UNITED STATES OF AMERICA,

    Defendant.

## ORDER CONCERNING MOTIONS FOR SUMMARY JUDGMENT

**Blackburn, J.**

This matter is before me on the following: 1) the plaintiff's **Motion for Summary Judgment with Incorporated Brief in Support** [#26], filed March 15, 2007; and 2) **Defendant United States of America's Motion for Summary Judgment and Brief in Support** [#58], filed August 10, 2007. The United States has filed a response [#34] to the plaintiff's motion for summary judgment, and the plaintiff has filed a reply [#42] and a supplemental reply [#51] in support of her motion for summary judgment. The plaintiff has not responded to the United States' motion for summary judgment. I deny the plaintiff's motion for summary judgment. I grant the defendant's motion for summary judgment in part, and I deny it in part.

### I. JURISDICTION

I have jurisdiction over this case under 28 U.S.C. § 1331 (federal question) and under 28 U.S.C. § 1346(b)(1) (Federal Tort Claims Act).

## II.  FACTS

Except as otherwise noted, the record reflects that the facts outlined below are not disputed.  This is an action for damages under the Federal Tort Claims Act (FTCA) arising out of the medical treatment of Jose Quintana, who died on August 14, 2004, during his stay at the Veterans Administration Medical Center (VAMC) in Denver, Colorado.  The plaintiff, Lucy Quintana, Mr. Quintana's surviving spouse, brings a wrongful death claim against the United States, alleging that "[t]he negligence of Defendant's employees, including the negligence of Amit Goyal, M.D. and the staff who treated and provided care to Mr. Quintana, caused Mr. Quintana's death." *Complaint* [#1], ¶ 52.  However, based on the opinions and deposition testimony of the plaintiff's lone designated expert, Marcia Eastlund, the plaintiff appears to have narrowed her claim to include only the alleged negligence of two nurses, Janice Yussef, a licensed practical nurse (LPN), and Tiffany Jara, a registered nurse (RN).  *Def.'s S.J. Br.* [#58], Exhibit A (Eastlund Report).

### A.  Facts Relating to Mr. Quintana's Care at the VAMC

In early July 2004, Mr. Quintana, who was 71 years old, came to the VAMC complaining of abdominal pain.  *Def.'s S.J. Br.* [#58], Ex. D at VA0013.  Mr. Quintana had many health problems, including high cholesterol, gastritis, and coronary artery disease.  *Id.*  He also had been diagnosed with prostate cancer in 200, which condition was being followed with "watchful waiting."  *Id.*  Mr. Quintana was admitted to the hospital on August 9, 2004 and, after undergoing several tests and x-rays, was diagnosed with metastatic gastric cancer on August 11, 2004.  *Id.* at VA0013–0014.  He

and his wife discussed treatment options with oncologists and planned to think about their options further before deciding what to do. *Id.* at VA0203, 0210. Mr. Quintana had an ongoing fever that was being treated by hospital staff. *Id.* at VA0210, 0378.

During the night and early morning of August 12–13, 2004, Mr. Quintana was observed by Nurse Yussef. Nurse Yussef took Mr. Quintana's vital signs at 12:20 a.m. and reported his elevated temperature to Nurse Jara, the RN on duty, between 12:30 a.m. and 1:00 a.m. Ex. D at VA0542, 0383. Nurse Jara assessed Mr. Quintana and noted that he was alert and complaining of leg pain and diarrhea. *Id.* at VA0383. She also paged Dr. Sarojkamal Bangaru to inform her of the complaints and was told to administer Tylenol and draw some blood cultures. *Id.* Nurse Jara placed the order for Tylenol and submitted blood samples to the lab. *Id.* She also asked Mr. Quintana if he had bloody stools and reported his negative response to Dr. Bangaru. *Id.*

At 1:30 a.m., Nurse Yussef again took Mr. Quintana's vitals. *Id.* at VA0542. At that point, his blood pressure and heart rate had dropped to below normal levels and his temperature was elevated. *Id.* However, there is no indication that Nurse Yussef informed any physicians, nurses, or other staff about Mr. Quintana's condition. Nurse Yussef next checked on Mr. Quintana at 3:00 a.m., at which time his heart rate and blood pressure were still low and his temperature remained elevated. *Id.* Again, Nurse Yussef did not inform any staff about Mr. Quintana's condition.

Nurse Yussef next checked on Mr. Quintana at 6:40 a.m., at which time his blood pressure had improved, but his heart rate was still low and his temperature had dropped to 97.5. *Id.* At 6:45 a.m., Nurse Yussef informed Nurse Jara that she was having difficulty obtaining Mr. Quintana's pulse oximetry reading. *Id.* at VA0383. Nurse

3

Jara went to Mr. Quintana and observed that he was responsive, but his fingernails were blue, his skin grey, and his blood pressure very low. *Id.* She called for assistance immediately. *Id.*

During Mr. Quintana's transfer to the ICU, a code was called. *Id.* at VA0015. Mr. Quintana was stabilized, but was determined to be septic. *Id.* He did not improve over the course of the day and was placed on "do not resuscitate" status with the approval of his family. *Id.* He was pronounced dead during the evening of August 14, 2004. *Id.*

**B.     Facts Relating to Nurse Yussef's Employment Status with VAMC**

The evidence relating to the procedure through which the VAMC obtained the services of Nurse Yussef is contained almost entirely in an affidavit attached to the defendant's summary judgment motion, the substance of which the plaintiff does not appear to dispute. *Def.'s S.J. Br.* [#58], Exhibit B (Kupecz Aff.). According to the affidavit testimony, when the VAMC has staffing shortages, the Eastern Colorado Health Care System (ECHCS) of the Department of Veteran's Affairs issues procurement requests and purchase order agreements to allow the VAMC to meet its additional staffing needs on an as-needed basis. *Id.* ¶¶ 1–2. Nurse Yussef's services were retained through a procurement request from ECHCS for the services of All Staff Medical Resources (All Staff), which is one of over a dozen agencies used by ECHCS for supplemental staffing needs. *Id.* ¶¶ 4–5.

There was no written agreement between ECHCS and All Staff in August 2004. *Id.* ¶ 4. However, the evidence indicates that the following procedures were in place. When ECHCS needed additional staffing, it would inform All Staff (or another of its

4

agencies), and All Staff would then inform ECHCS which of its personnel was available for the needed coverage.  *Id.* ¶ 6.  All Staff would submit an invoice to ECHCS for the services provided, and ECHCS would then prepare a form 1358, Miscellaneous Obligation Form, for the payment of All Staff.  *Id.* ¶ 4.  ECHCS paid All Staff directly, on an hourly basis, for the services provided.  *Id.* ¶ 7.  ECHCS paid All Staff a set rate for the type of staff, and that rate did not vary with the specific individual provided to work at ECHCS.  *Id.*

ECHCS does not determine how much the All Staff individual is paid or how many total hours per week he or she works.  *Id.*  ECHCS does not pay any social security or workers' compensation taxes, does not withhold any income taxes, and does not provide liability insurance or any sort of benefits to the individual workers.  *Id.* ¶ 8.  In addition, ECHCS is not involved in the hiring or firing of individuals by All Staff and is not involved in checking their background or experience, other than reviewing the information that All Staff provides.  *Id.* ¶ 6.

The plaintiff moves for summary judgment on the issue of the defendant's liability for the alleged negligence of Nurse Yussef.  The plaintiff argues that Nurse Yussef was the defendant's employee when she treated Mr. Quintana and that the defendant has made a judicial admission that Nurse Yussef's negligence caused Mr. Quintana's death.  The defendant moves for summary judgment on all claims, arguing that Nurse Yussef was an independent contractor, and not an employee of the United States, and that the United States thus is immune from suit based on any torts allegedly committed by Nurse Yussef.  With respect to Nurse Jara, the defendant contends there is no evidence that her alleged negligence proximately caused Mr. Quintana's death.

5

Finally, the defendant argues that there is no evidence to support any claim of negligence involving other VA employees.

## III. STANDARD OF REVIEW

The purpose of a summary judgment motion is to assess whether trial is necessary. ***White v. York Int'l Corp.***, 45 F.3d 357, 360 (10th Cir. 1995). FED. R. CIV. P. 56 (c) provides that the court may grant summary judgment when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." FED. R. CIV. P. 56(c); see ***Anderson v. Liberty Lobby, Inc.***, 477 U.S. 242, 250 (1986); ***Concrete Works, Inc. v. City & County of Denver***, 36 F.3d 1513, 1517 (10th Cir.1994). Summary judgment may be granted if the court concludes that no "rational trier of fact" could find for the nonmoving party based on the showing made in the motion and response. ***Matsushita Electric Industrial Co. v. Zenith Radio Corp.***, 475 U.S. 574, 587 (1986).

## IV. ANALYSIS

### A. Alleged Negligence of LPN Yussef

*1. Waiver of Sovereign Immunity* The FTCA operates as a consent to suit against the United States for certain torts committed by federal employees acting within the scope of their employment. ***Woodruff v. Covington***, 389 F.3d 1117, 1125 (10th Cir. 2004) (citing 28 U.S.C. § 1346(b)). This consent to suit "does not extend to acts of independent contractors or their employees." ***Bird v. United States***, 949 F.2d 1079, 1080 (10th Cir. 1991). Thus, the United States is immune from suit for the actions of LPN Yussef if she was an independent contractor, rather than an employee of the

United States, at the time she treated Mr. Quintana. The question of whether one is an employee of the United States is to be determined under federal law. ***Lurch v. United States***, 719 F.2d 333, 337 (10th Cir. 1983), ***cert. denied***, 466 U.S. 927 (1984).

Under well-settled Tenth Circuit law, the "critical question in determining whether an individual is a federal employee or an independent contractor for purposes of the FTCA is 'whether the federal government has the power to control the detailed physical performance of the individual'"; that is, "whether the government supervises the individual's day-to-day operations." ***Tsosie v. United States***, 452 F.3d 1161, 1163 (10th Cir. 2006) (quoting ***Duplan v. Harper***, 188 F.3d 1195, 1200 (10th Cir. 1999)). The Tenth Circuit has set forth seven factors to consider in making this determination:

> (1) the intent of the parties; (2) whether the United States controls only the end result or may also control the manner and method of reaching the result; (3) whether the person uses her own equipment or that of the United States; (4) who provides liability insurance; (5) who pays social security tax; (6) whether federal regulations prohibit federal employees from performing such contracts; and (7) whether the individual has authority to subcontract to others.

***Lilly v. Fieldstone***, 876 F.2d 857, 859 (10th Cir. 1989).

The situation in this case is very similar to that in ***Bird***, in which the Tenth Circuit held that a certified registered nurse anesthetist (CRNA) was an employee of a government hospital. ***Bird***, 949 F.2d at 1088. The hospital in ***Bird*** was short on anesthesia staff and obtained an additional CRNA through a temporary placement service, Grinovich & Associates. 949 F.2d at 1080–81. There was no written agreement between the government and Grinovich other than specific requisitions for service. The requisitions provided that Grinovich would furnish anesthesia coverage during a specified time period and stated that "the government would not be

7

responsible for the negligence of 'the contractor'; that the 'vendor' would provide his own insurance; and that all equipment would be supplied by the government." *Id.* at 1081. The hospital paid Grinovich a lump sum for s services "with the understanding that it would pay the anesthetist." *Id.* Under state law, CRNAs administering anesthesia were required to be "under the supervision of and in the immediate presence of a physician licensed to practice medicine." *Id.*

In holding that the CRNA in question was an employee, the court noted that there was no provision in the requisition for service stating that the CRNA should not be considered an employee of the hospital and that "Grinovich's position . . . was similar to any other employment agency providing references of prospective employees to employers, in this case by form of contract-requisition in a course of practice to meet the special procedural requirements of the government." *Id.* at 1084–85. The court distinguished **Bird** from cases involving the employment status of physicians, which require courts to attempt to "apply[] control rationale to physicians who under professional standards must reserve to themselves free from outside control or supervision full responsibility for professional decisions whether employees or independent contractors." *Id.* at 1085. The court found persuasive both the existence of the statute placing the CRNA under the control and supervision of employee physicians of the hospital as well as the fact that the CRNA "was under the control and supervision of the government surgeon at the hospital to the same extent" as other nurse employees of the hospital. *Id.*

In a more recent case involving the same issue, the United States District Court for the District of New Mexico distinguished **Bird** and found that the CRNA in question

8

was an independent contractor of a government hospital. *Garcia v. Reed*, 227 F. Supp. 2d 1183 (D.N.M. 2002). The court found that, unlike in *Bird*, the written agreement between the hospital and the CRNA evidenced the intent of the parties to create an independent contractor relationship because the contract provided (1) the CRNA accepted the assignment to the hospital "as an independent contractor CRNA" and that she was "not an employee of [the placement coordinator agency] or the [hospital] for which I perform temporary anesthesia services"; (2) the CRNA was to provide her own liability insurance and was solely responsible for payment of taxes; and (3) the placement agency was responsible for sending and paying a relief contractor to fill in as needed. *Id.* at 1191. The court also found persuasive the fact that the state statute governing CRNAs did not contain language similar to the applicable statute in *Bird* requiring a physician to "supervise" or be "present" during a procedure administered by the CRNA. *Id.* at 1193–94. The absence of such language, along with the lack of evidence showing "that the hospital controlled or supervised the manner in which [the CRNA] rendered medical treatment or anesthesia to patients," led the district court to hold the CRNA was an independent contractor, rather than an employee, of the government hospital. *Id.* at 1192–94.

The facts of this case more closely resemble those in *Bird* than in *Garcia*. As in *Bird*, there is no written agreement between the VAMC and All Staff or the individual workers and there is no language in any of the relevant documents stating that LPN Yussef was an independent contractor and not an employee of the VAMC. In addition, Colorado law defines the "practice of practical nursing" as "the performance, under the supervision of a dentist, physician, podiatrist, or professional nurse authorized to

9

practice in this state, of those services requiring the education, training, and experience, as evidenced by knowledge, abilities, and skills required in this article for licensing as a practical nurse . . . ." C.R.S. § 12-38-103(9). Under state law, Nurse Yussef may practice as an LPN only when she is under the supervision of a specified professional health care provider. The defendant has stipulated that, during Nurse Yussef's relevant shift on the night of August 12, 2004, through the morning of August 13, 2004, she was "performing practical nursing services under the supervision of Nurse Jara, as those terms are used in C.R.S. § 12-38-103(9)," and that RN Jara was an employee of the VAMC. *Stipulation* [#50], filed July 8, 2007.

In light of these facts, I conclude that **Bird** is controlling and mandates a finding that Nurse Yussef was an employee of the VAMC under the FTCA. Although it is undisputed that the VAMC did not provide malpractice insurance for Nurse Yussef or withhold taxes on her behalf, applying the fourth and fifth **Lilly** factors, these facts are insufficient to show that Nurse Yussef was an independent contractor. Again, the "critical inquiry" in the analysis is "whether the federal government has the power to control the detailed physical performance of the individual." **Duplan**, 188 F.3d at 1200. The undisputed facts in the record demonstrate that the VAMC had the power to control the detailed physical performance of Nurse Yussef and that, under state statute, Nurse Jara was required to supervise Nurse Yussef. This factor weighs heavily toward a finding that Nurse Yussef was an employee for the purposes of the FTCA. In a similar vein, the Tenth Circuit came to its conclusion in **Bird** despite the fact that the hospital's requisition for services provided that the "vendor would provide his own insurance." 949 F.2d at 1081.

The defendant attempts to distinguish this case from ***Bird***, noting first that the statute at issue in ***Bird*** made it a crime for a CRNA to administer anesthesia without being "under the supervision of *and in the immediate presence of* a physician," while the statute at issue here is not a criminal statute and does not contain the language requiring "immediate presence" of a physician or professional nurse. ***Bird***, 949 F.2d at 1081; *Def.'s Resp.*, p. 11. These distinctions are not meaningful because the Colorado statute at issue governs Nurse Yussef's practice as a licensed practical nurse and requires supervision by a physician or nurse. In this case, that supervision was provided by Nurse Jara, a VAMC employee. The defendant's reliance on case law holding that a physician is not rendered a hospital employee merely because he is subject to hospital rules or general regulation of his activities is misplaced. ***Lilly***, 876 F.2d at 860; ***Lurch***, 719 F.2d at 338 n.9. As was the case in ***Bird***, this case does not involve a physician who necessarily must "reserve to [himself] free from outside control or supervision full responsibility for professional decisions" regardless of employment status. ***Bird***, 949 F.2d at 1085. Rather, Nurse Yussef was by statute and in fact supervised in the performance of her duties as an LPN while working at the VAMC.

In sum, some of the ***Lilly*** factors weigh in favor of independent contractor status. Considered together, however, the factors weigh in favor of the conclusion that Nurse Yussef was an employee of the VAMC, for the purpose of the FTCA, when she treated Mr. Quintana.

***2. Judicial Admission*** The plaintiff contends that the defendant has admitted that Nurse Yussef's negligence caused Mr. Quintana's death and the plaintiff's resulting injuries. The plaintiff claims she is entitled to summary judgment on the issue

11

of the defendant's liability based on this purported admission. The alleged admission is contained in a Designation of Nonparty at Fault [# 21] filed by the defendant under §13-21-111.5(3)(b), C.R.S. This statute provides that "[n]egligence or fault of a nonparty may be considered if . . . the defending party gives notice that a nonparty was wholly or partially at fault within ninety days following commencement of the action . . . ." *Id*. The designation is consistent with the defendant's position that Nurse Yussef was not an employee of the VAMC at the time she treated Mr. Quintana. The defendant stated in the designation that "[w]ith respect to her care on August 13, 2004, Nurse Yussef provided negligent and substandard care in the area of nursing. Further, these actions breached her duty of care and caused injuries to Mr. Quintana that resulted in his death, and thus also caused the related alleged injuries suffered by Ms. Quintana." *Designation of Nonparty at Fault* [#21], p. 2.

Whether the plaintiff now is entitled to summary judgment on the defendant's liability depends on whether the statements made by the defendant in the designation qualify as judicial admissions. Judicial admissions are "'formal, deliberate declarations which a party or his attorney makes in a judicial proceeding for the purpose of dispensing with proof of formal matters or of facts about which there is no real dispute.'" **U.S. Energy Corp. v. Nukem, Inc.**, 400 F.3d 822, 833 n.4 (10th Cir. 2005) (quoting **Kempter v. Hurd**, 713 P.2d 1274, 1279 (Colo. 1986)). However, "inconsistent statements made in the alternative are not formal, deliberate declarations that could reasonably be construed as judicial admissions." *Id.*

I find that the defendant's statement regarding Nurse Yussef's negligence contained in the Designation of Nonparty at Fault is not a judicial admission. In its

12

amended answer to the plaintiff's complaint, the defendant denies all allegations that the defendant's employees were negligent or that the negligence of the defendant's employees proximately caused Mr. Quintana's death and the plaintiff's injuries. *Am. Answer* [# 20], ¶¶ 51–54. The defendant asserts also as defenses that the plaintiff's injuries were caused by the negligence of third parties and that the defendant was not liable for the negligence of contractors. *Id.*, ¶¶ 11–12. The Designation of Nonparty at Fault obviously is related to those defenses. The defendant is entitled to maintain both the position that Nurse Yussef was a nonparty at fault and the inconsistent, alternative positions that, as an employee, Nurse Yussef was not negligent and that her negligence, if any, did not proximately cause the plaintiff's injuries. Thus, I conclude that the statements of made by the defendant in the Designation of Nonparty at Fault do not constitute a judicial admission that Nurse Yussef was negligent. The plaintiff is not entitled to summary judgment on the issue of the defendant's liability.

### B. Alleged Negligence of RN Jara

Although it is stipulated that Nurse Jara was an employee of the VAMC when she rendered care to Mr. Quintana, the defendant contends it is entitled to summary judgment on the plaintiff's claims relating to Nurse Jara's conduct because it is "<u>undisputed</u> that any alleged negligence by Nurse Jara did not cause plaintiff's injuries." *Def.'s S.J. Br.*, p. 15 (emphasis in original). One of the *prima facie* elements a plaintiff must satisfy in a negligence case is that the breach of the standard of care was a proximate cause of the alleged injuries. **United Blood Servs. v. Quintana**, 827 P.2d 509, 519 (Colo. 1992). In addition, "[e]xpert testimony is required to establish a prima facie case of professional negligence in the great majority of cases." **Williams v.**

13

***Boyle***, 72 P.3d 392, 397 (Colo. App. 2003).  Although there is an exception to this requirement in cases in which the subject matter "lies within the ambit of common knowledge or experience of ordinary persons," ***Svendsen v. Robinson***, 94 P.3d 1204, 1208 (Colo. App. 2004), the plaintiff does not contend, and there is no indication in the record, that this case falls within that exception.  For the plaintiff's claim of negligence against Nurse Jara to survive summary judgment, there must be evidence in the form of expert testimony that Nurse Jara breached the applicable standard of care and that such breach was a proximate cause of the plaintiff's injuries.

The defendant contends that, while there may be a fact issue as to whether Nurse Jara breached the applicable standard of care, the plaintiff's own expert testified that any breach by Nurse Jara did not cause Mr. Quintana's death.  Thus, the defendant argues, the plaintiff has presented no evidence in support of the causation element of her negligence claim against RN Jara.

The plaintiff's expert, Marcia Eastlund, provided an expert report opining that Nurse Jara deviated from the standard of care in treating Mr. Quintana during the early morning hours of August 13, 2004 in two ways: (1) she failed to perform and document a complete assessment of Mr. Quintana when Nurse Yussef informed her of his elevated temperature between 12:30 am. and 1:00 a.m.; and (2) she failed to properly supervise Nurse Yussef.  *Def.'s S.J. Br.,* Ex. A, pp. 2-3.  With regard to the first deviation, Eastlund elaborated in her deposition that Nurse Jara's assessment of Mr. Quintana was incomplete because she did not ask him about the nature of the quad pain he was having and she did not assess his bowel sounds or ask him about the nature of his stools despite the fact that he was having diarrhea.  *Def.'s S.J. Br.*, Exhibit

C (Eastlund Depo.), pp. 90–91. When asked whether these failures contributed to Mr. Quintana's death, Eastlund responded that she "can't say that [they] contributed to death. It just goes to show she did not do the job she needed to do." *Id.*, pp. 91–92. In light of this testimony, I agree with the defendant that the plaintiff has presented no evidence that Nurse Jara's assessment of Mr. Quintana, assuming it fell below the applicable standard of care, was a proximate cause of his death.

Eastlund opined also that RN Jara failed properly to supervise Nurse Yussef. Eastlund noted in her report and deposition that, after Nurse Jara assessed Mr. Quintana at approximately 1:00 a.m. and ordered Tylenol to address his elevated temperature, she "should have returned to the patient to determine if the medication was effective in bringing down the temperature." *Eastlund Depo.*, p. 94. However, Eastlund recognized that Nurse Yussef had taken Mr. Quintana's temperature after the Tylenol was administered, that his temperature had reduced slightly, and that Nurse Jara's "failure to personally determine whether the Tylenol was reducing Mr. Quintana's temperature" did not contribute to his death. *Id.*

Eastlund then testified as follows with regard to her opinion as to Nurse Jara's failure to personally check on or assess Mr. Quintana between 1:00 a.m. and 6:45 a.m., at which time she was notified that Nurse Yussef was having difficulty obtaining a pulse oximetry reading on Mr. Quintana:

> Q     In your opinion how many times should the RN have checked on Mr. Quintana between the time she was first alerted about the elevated temperature by the LPN?
>
> A     Generally speaking the RN should check on patients every two hours.
>
> Q     And is that in all circumstances?

15

> A  Not necessarily. It's just a general rule of thumb that they should be checked on every two hours. And especially since the LPN had called her earlier and said that there was a problem. I would have been in the room every two hours.
>
> Q  And when you say check on the . . . patient, what sort of things would the RN do if they were checking on a patient every two hours?
>
> A  I would talk with the LPN, say[], What's going on with him? I would go into the room – and especially at night I would not want to necessarily disturb this patient if they're sleeping, but I would at least eyeball them and check the record to see what's going on. Ask the LPN if they had taken the temperature again.
>
> I mean, there's no sense giving Tylenol if you're not going to check to see if it's effective. That's part of doing a complete job as I call it.
>
> So there were things that, you know, in my opinion she should have asked about. There again, he was having diarrhea. Was he still having diarrhea? You know, does this man need something further for the diarrhea? So there were several reasons she should have checked on Mr. Quintana.

*Eastlund Depo.*, pp. 95–96. Eastlund testified also that it would have been reasonable for the RN to delegate to the LPN the task of taking Mr. Quintana's temperature and his other vital signs after the Tylenol was administered. *Id.*, p. 97.

The defendant appears to argue that, because Eastlund testified it was reasonable for Nurse Jara to delegate the taking of Mr. Quintana's vital signs to the LPN, this negates any causal connection between Nurse Jara's failure to personally check on Mr. Quintana between 1:00 a.m. and 6:45 a.m. and his death. *Def.'s S.J. Br.*, p. 17. However, Eastlund faults Nurse Jara not merely for failing to personally take Mr. Quintana's temperature or vital signs during those several hours, but for failing to check on him at all, either by personally assessing him or speaking to the LPN about his

16

condition. *Def.'s S.J. Br.*, Ex. A (Eastlund Report), p. 3. Eastlund concluded that Nurse Jara "failed to continuously evaluate M[r]. Quintana's condition and report abnormalities that occurred on the night shift of 8/12/04 2330 to 0800." *Id.* Eastlund also testified that the LPN's failure to report Mr. Quintana's abnormal vital signs "greatly contributed to his death." *Eastlund Depo.*, p. 72. Because Eastlund also faults Nurse Jara for similar conduct, there is some evidence from an expert witness that Nurse Jara's negligence, which involved a failure to monitor and report Mr. Quintana's condition, proximately caused his death. Therefore, the defendant is not entitled to summary judgment on the plaintiff's negligence claims as they relate to Nurse Jara's alleged negligent failure properly to supervise Nurse Yussef.

### C. Alleged Negligence of Other VAMC Employees

To the extent the plaintiff has not voluntarily abandoned her claims against the United States based on the alleged negligence of VAMC employees other than Nurse Jara and Nurse Yussef, the defendant is entitled to summary judgment on such claims. The plaintiff has provided no expert testimony to support these claims. *Williams*, 72 P.3d at 397 (requiring expert testimony to establish *prima facie* case of negligence in medical malpractice case).

### V. ORDERS

**THEREFORE, IT IS ORDERED** as follows:

1. That the plaintiff's **Motion for Summary Judgment with Incorporated Brief in Support** [#26], filed March 15, 2007, is **DENIED**;

2. That the **Defendant United States of America's Motion for Summary Judgment and Brief in Support** [#58], filed August 10, 2007, is **DENIED** to the extent the plaintiff's claims are based on the alleged negligence of Janice Yussef, LPN;

3. That the **Defendant United States of America's Motion for Summary Judgment and Brief in Support** [#58], filed August 10, 2007, is **DENIED** to the extent the plaintiff's claims are based on the alleged negligence of Tiffany Jara, RN in supervising the work of Janice Yussef, LPN;

4. That the **Defendant United States of America's Motion for Summary Judgment and Brief in Support** [#58], filed August 10, 2007, otherwise is **GRANTED**.

Dated March 17, 2008, at Denver, Colorado.

**BY THE COURT:**

s/ Robert E. Blackburn
**Robert E. Blackburn**
**United States District Judge**